IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 24-13978-G
LT NO. 1:21-cv-23727-DPG

---

LIL' JOE RECORDS, INC.,

*Plaintiff/Appellant*,

v.

RAVEN ROSS, CHRISTOPHER WONG WON, JR., RODERICK WONG WON, LETERIUS RAY, ANISSA WONG WON AND LUTHER CAMPBELL,

*Defendants/Appellees*.

---

OPENING BRIEF OF APPELLANT LIL' JOE RECORDS, INC.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

Richard C. Wolfe
WOLFE LAW MIAMI, PA
175 SW 7th Street, Suite 2410
Miami, Florida 33130
Telephone: (305) 384-7370
Facsimile: (305) 384-7371
rwolfe@wolfelawmiami.com

Elliot B. Kula
KULA & ASSOCIATES, P.A.
12000 Biscayne Boulevard, Suite 221
Miami, Florida 33181
Telephone: (305) 354-3858
Facsimile: (305) 354-3822
eservice@kulalegal.com
elliot@kulalegal.com

*Counsel for Plaintiff/Appellant Lil' Joe Records, Inc.*

*LIL' JOE RECORDS, INC. V. WONG WON, ET AL.*
**CASE NO. 24-13978-G**

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
**CORPORATE DISCLOSURE STATEMENT**

Plaintiff/Appellant, Lil' Joe Records, Inc., submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1.  Burroughs, Scott, Esq. — *Counsel for Defendants/Appellees*

2.  Campbell, Luther — *Defendant/Appellee*

3.  Daniel, William Aaron, Esq. — *Counsel for Plaintiff/Appellant*

4.  Doniger / Burroughs — *Counsel for Defendants/Appellees*

5.   Gayles, Hon. Judge Darrin P. — *District Court Judge*

6.  Jenkins, David, Esq. — *Counsel for Defendants/Appellees*

7.  Kula, Elliot B., Esq. — *Counsel for Plaintiff/Appellant*

8.  Kula & Associates, PA — *Counsel for Plaintiff/Appellant*

9.  Lil' Joe Records, Inc. — *Plaintiff/Appellant*

10. Nieves, Angela Maria, Esq. — *Counsel for Defendants/Appellees*

11. Orshan, Paul L., Esq. — *Counsel for Plaintiff/Appellant*

12. Ray, Leterius — *Defendant/Appellee*

13. Ross, Mark — *Defendant/Appellee*

*LIL' JOE RECORDS, INC. V. WONG WON, ET AL*
**Case No. 24-13978-G**

**CERTIFICATE OF INTERESTED PERSONS
AND
CORPORATE DISCLOSURE STATEMENT**
(Continued)

14.    Ross, Raven — *Defendant/Appellee*

15.    Rothman, Joel Benjamin, Esq. — *Counsel for Defendants/Appellees*

16.    Sriplaw, PA — *Counsel for Defendants/Appellees*

17.    Torres, Hon. Magistrate Judge Edwin G — *Magistrate Judge*

18.    Trechsel, Frank R., Esq. — *Counsel for Defendants/Appellees*

19.    Weinberger, Joseph — *President and Owner of Lil' Joe Records, Inc.*

20.    Wolfe Law Miami, P.A. — *Counsel for Plaintiff/Appellant*

21.    Wolfe, Richard, Esq. — *Counsel for Plaintiff/Appellant*

22.    Wong Won, Anissa — *Defendant/Appellee*

23.    Wong Won, Christopher, Jr. — *Defendant/Appellee*

24.    Wong Won, Roderick —*Defendant/Appellee*

Lil' Joe Records, Inc., pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.101 through 26.1-3, hereby discloses that it has no parent corporation and no publicly-held companies hold 10% or more of its stock, and further that:

Joseph Weinberger is an individual.

Lil' Joe Records, Inc., is a Florida Corporation.

/s/ Elliot B. Kula
Elliot B. Kula

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would significantly aid the Court's decision-making process given the complex and novel issues presented.

*First*, this appeal concerns nuanced principles of copyright ownership, the application of the Copyright Act, and the boundaries of artist/employer ownership, which ownership was delineated in an unambiguous recording contract, conferring on the record label copyrights in the works "from inception."

*Second*, this case presents a novel issue of first impression concerning the interplay between the Bankruptcy Code and the Copyright Act — specifically, whether an author's statutory right to terminate copyright transfers under 17 U.S.C. § 203 becomes property of the author's bankruptcy estate pursuant to 11 U.S.C. § 541. This question requires careful analysis of statutory language and two separate statutory frameworks, which would be illuminated through oral argument.

*Third*, the resolution of these legal questions will substantially contribute to the jurisprudence in both bankruptcy and copyright law. The Court's decision will provide important guidance on the scope of § 541's "all legal and equitable interests" language as it relates to future, contingent interests like termination rights, and will clarify when creators are "employees" versus independent contractors for copyright purposes in the music industry context.

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF CITATIONS ..................................................................................v

STATEMENT OF JURISDICTION...................................................................1

STATEMENT OF THE ISSUES.......................................................................1

    I.    The District Court Erred in Granting Summary Judgment
    and Ruling that 2 Live Crew's Termination Rights were
    Inalienable through Bankruptcy. ...........................................................1

    II.    The District Court Erred When It Denied Appellant Lil'
    Joe Records, Inc.'s Motion for Judgment as a Matter of
    Law. ...................................................................................................2

STATEMENT OF THE CASE..........................................................................3

    I.    STATEMENT OF THE FACTS.............................................................3

        A.    The Formation and Success of 2 Live Crew...............................3

        B.    The 1991 Recording Agreements. ................................................4

        C.    The Purported 1990 Agreement....................................................5

        D.    Joseph Weinberger Joined Luke Records as CFO......................8

        E.    The Bankruptcies and Transfer of Copyright
            Ownership. ...................................................................................8

        F.    The Ross Bankruptcy and Wong Won Settlement. ..................10

        G.    The Termination Notice and Litigation. ....................................11

# TABLE OF CONTENTS
## (Continued)

**Page**

II.   COURSE OF PROCEEDINGS. ........................................................12

    A.   Complaint. ..........................................................................12

    B.   Answer and Counterclaim. ................................................13

    C.   The Cross-Motions for Summary Judgment. ...................14

    D.   Trial. ...................................................................................17

    E.   Post-Trial Motions. ...........................................................20

STATEMENT OF THE STANDARD OF REVIEW .............................................22

SUMMARY OF ARGUMENT .................................................................................24

ARGUMENT .............................................................................................................25

I.   THE DEFENDANTS' TERMINATION RIGHTS
    WERE TRANSFERRED TO THE BANKRUPTCY
    ESTATE. ........................................................................................25

II.   LIL' JOE WAS ENTITLED TO JUDGMENT AS A
    MATTER OF LAW BECAUSE THE 1990
    AGREEMENT VESTED OWNERSHIP IN THE
    COPYRIGHTS WITH LUKE RECORDS. ...................................33

    A.   The Plain Language of the 1990 Agreement
        Vested Initial Ownership of the Copyrights in
        Luke Records. ....................................................................33

    B.   The Trial Evidence Confirmed Defendants Were
        Artists for Hire. ..................................................................38

    C.   The 1990 Agreement Was Not a Valid Transfer of
        Copyrights Because It Did Not Reference Any
        Alleged Prior Oral Agreements. ........................................41

## TABLE OF CONTENTS
(Continued)

**Page**

D.    The Termination Notice Was Ineffective as to All
Other Possible Grants of Copyrights. .......................................43

CONCLUSION ........................................................................................44

CERTIFICATE OF COMPLIANCE.......................................................45

CERTIFICATE OF SERVICE ................................................................45

# TABLE OF CITATIONS

<u>**Page**</u>

### *Cases*

*Andersen Windows, Inc. v. Hochberg*,
  997 So. 2d 1212 (Fla. 3d DCA 2008) ...................................................33

*Calderon v. U.S. Bank Nat'l Ass'n*,
  860 F. App'x 686 (11th Cir. 2021) .....................................................28

*Camp v. St. Paul Fire & Marine Ins. Co.*,
  616 So. 2d 12 (Fla. 1993) ...................................................................27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................22

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ...........................................................................36

*Cobb v. TSI Telcoms. Servs.*,
  172 F. App'x 293 (11th Cir. 2006) .....................................................23

*Denadai v. Preferred Cap. Mkts.*,
  272 B.R. 21 (D. Mass. 2001) ..............................................................29

*Dirico v. Redland Estates, Inc.*,
  154 So. 3d 355 (Fla. 3d DCA 2014) ...................................................33

*Envtl. Servs., Inc. v. Carter*,
  9 So. 3d 1258 (Fla. 5th DCA 2009) ....................................................42

*Field v. Transcon. Ins. Co.*,
  219 B.R. 115 (E.D. Va. 1998) .............................................................29

*GOT I, LLC v. XRT, Inc.*,
  798 F. App'x 505 (11th Cir. 2020) .....................................................23

*Hahamovitch v. Hahamovitch*,
  174 So. 3d 983 (Fla. 2015) .................................................................33

## TABLE OF CITATIONS
(Continued)

**Page**

*Hudgens v. Bell Helicopters/Textron*,
   328 F.3d 1329 (11th Cir. 2003) ............................................................22

*In re Allen*,
   226 B.R. 857 (Bankr. N.D. Ill. 1998) ..................................................28

*In re Dias*,
   37 B.R. 584 (Bankr. D. Idaho 1984)....................................................29

*In re Dittmar*,
   618 F.3d 1199 (10th Cir. 2010) ........................................... 25, 29, 31

*In re Icarus Holding, LLC*,
   391 F.3d 1315 (11th Cir. 2004) ...........................................................28

*In re Jeter*,
   257 B.R. 907 (B.A.P. 8th Cir. 2001) ........................................... 30, 31

*In re Mortg. Am. Corp.*,
   714 F.2d 1266 (5th Cir. 1983) .............................................................25

*In re Neuton*,
   922 F.2d 1379 (9th Cir. 1990) .............................................................29

*In re Optical Techs., Inc.*,
   246 F.3d 1332 (11th Cir. 2001) ...........................................................22

*In re Peterson*,
   280 B.R. 886 (Bankr. S.D. Ala. 2001)................................................31

*In re Smith*,
   189 B.R. 8 (N.D. Ill. 1995) .................................................................29

*In re Wick*,
   276 F.3d 412 (8th Cir. 2002) ...............................................................28

*In re Wise*,
   346 F.3d 1239 (10th Cir. 2003) ...........................................................31

# TABLE OF CITATIONS
### (Continued)

**Page**

*In re Yonikus*,
  996 F.2d 866 (7th Cir. 1993) ................................................25

*In re: Bilzerian*,
  264 B.R. 726 (Bankr. M.D. Fla. 2001) ...............................26

*Int'l Expositions, Inc. v. City of Miami Beach*,
  274 So. 2d 29 (Fla. 3d DCA 1973) ......................................33

*J. C. Penney Co., Inc. v. Koff*,
  345 So. 2d 732 (Fla. 4th DCA 1977) ...................................38

*Lyrick Studios, Inc. v. Big Idea,*
  *Prods.*, 420 F.3d 388 (5th Cir. 2005)...................................41

*Matter of Yonikus*,
  974 F.2d 901 (7th Cir. 1992) ...............................................29

*Muller v. Walt Disney,*
  *Prods.*, 871 F. Supp. 678 (S.D.N.Y. 1994)..........................37

*Perez-Gurri Corp. v. McLeod*,
  238 So. 3d 347 (Fla. 3d DCA 2017) ...................................36

*Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*,
  363 F.3d 1089, 1091 (11th Cir. 2004) ................................33

*Radio Tel. Espanola S.A. v. New World Enter., Ltd.*,
  183 F.3d 922 (9th Cir. 1999) ...............................................41

*Segal v. Rochelle*,
  382 U.S. 375 (1966)..............................................................29

*Steward v. Champion Int'l Corp.*,
  987 F.2d 732 (11th Cir. 1993) .............................................22

*Teague v. Teague*,
  122 So. 3d 938 (Fla. 4th DCA 2013) ...................................38

## TABLE OF CITATIONS
(Continued)

**Page**

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003) ..................................................................... 35, 38

*White v. White*,
   141 So. 3d 645 (Fla. 4th DCA 2014) ..................................................................38

### *Statutes*

11 U.S.C. § 101 (2024) ...........................................................................................26

11 U.S.C. § 363 ............................................................................................ 9, 15, 20

11 U.S.C. § 541 (2024) ................................................................................... passim

11 U.S.C. § 554 ................................................................................................. 28, 31

15 U.S.C. § 1121 ....................................................................................................1

15 U.S.C. § 1501 ....................................................................................................1

17 U.S.C. § 101 (2024) .......................................................................................1, 35

17 U.S.C. § 201 (2024) ...................................................................................... 26, 35

17 U.S.C. § 203 (2024) ................................................................................... passim

17 U.S.C. § 204 (2024) ...........................................................................................41

28 U.S.C. § 1367 ....................................................................................................1

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

28 U.S.C. § 2201 ....................................................................................................1

28 U.S.C. § 1338 ....................................................................................................1

**TABLE OF CITATIONS**
(Continued)

**Page**

***Rules***

Fed. R. Civ. P. 50 ................................................................... 19, 20, 22, 23


***Regulations***

37 CFR § 201.10 ............................................................................. 19, 43

## STATEMENT OF JURISDICTION

The underlying litigation arose under 28 U.S.C. § 2201, the Copyright Act, 17 U.S.C. § 101, *et seq*., and the Lanham Act, 15 U.S.C. § 1501, *et seq*. The district court had subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367(a).

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, because this appeal arises from a final judgment of the district court.

## STATEMENT OF THE ISSUES

**I. The District Court Erred in Granting Summary Judgment and Ruling that 2 Live Crew's Termination Rights were Inalienable through Bankruptcy.**

a. Section 541 of the Bankruptcy Code defines property of the estate as including "all legal or equitable interests of the debtor," encompassing contingent and future interests. Copyright termination rights are legal interests in intellectual property with a defined monetary value. Did the district court err in ruling that termination rights are exempt from bankruptcy estates when neither the Bankruptcy Code nor the Copyright Act creates such an exemption?

b. Copyright termination under Section 203 affects "only those rights covered by grants that arise under [the Copyright Act]" and expressly excludes "rights arising under any other Federal law." Lil' Joe Records, Inc.'s ownership rights stem from bankruptcy court orders issued under the Bankruptcy Code.

1

Are these federally-created rights exempt from termination under Section 203(b)(5)'s plain language?

## II. The District Court Erred When It Denied Appellant Lil' Joe Records, Inc.'s Motion for Judgment as a Matter of Law.

a. Section 201 of the Copyright Act provides that copyright in a work "vests initially in the author," but that "[i]n the case of a work made for hire, the employer … is considered the author." The 1990 Agreement—the only contract identified in the Termination Notice—stated that Luke Records owned the sound recordings "from the inception of their creation" and contained no language transferring ownership from the artists 2 Live Crew. Did the district court err in allowing the jury to find this agreement transferred copyrights that the 2 Live Crew members never owned in the first place?

b. Section 204(a) of the Copyright Act requires a written and signed conveyance, note or memorandum of the transfer, and that writing must specifically reference that prior agreement. The Appellees, three of the four members of 2 Live Crew, alleged the 1990 Agreement memorialized prior oral transfers of copyrights, but the Agreement contained no reference to any prior oral agreements and included an integration clause expressly disclaiming other agreements. Did the district court err in accepting the theory that this agreement memorialized unspecified oral transfers despite lacking the required statutory elements?

2

## STATEMENT OF THE CASE

**I.   STATEMENT OF THE FACTS.**

**A.   The Formation and Success of 2 Live Crew.**

2 Live Crew was a notable rap group comprised of Luther Campbell, Christopher Wong Won, Mark Ross, and David Hobbs.  [ECF 1 at 2; ECF 32 at 1–2].  The group gained notoriety in the 1980s and 1990s for its explicit content, which became the center of public controversy and legal challenges.  [ECF 210 at 2].

Between 1986 and 1989, 2 Live Crew recorded five albums (collectively, the "Subject Albums"):  The 2 Live Crew Is What We Are (1986), Move Somethin' (1988), Move Somethin' (Clean) (1988), As Nasty As They Wanna Be (1989), and As Clean As They Wanna Be (1989).  [ECF 210 at 2].  These albums were released under various iterations of Luther Campbell's record label, which was initially known as Luke Skyywalker Records, Inc., subsequently renamed Skyywalker Records, Inc., and finally Luke Records, Inc. (hereinafter collectively "Luke Records").  [ECF 210 at 2].

The Subject Albums achieved significant commercial success.  As Nasty As They Wanna Be and As Clean As They Wanna Be were certified Platinum, while 2 Live Is What We Are and Move Somethin' were certified gold.  [ECF 251 at 3].  That is, by 1990, the value of the copyrights was well-known, and Atlantic Records had provided Luke Records with a $5 million advance to distribute the Subject Albums.  [ECF 251 at 3; ECF 276 at 119–20; ECF 277 at 20].

3

**B.   The 1991 Recording Agreements.**

In 1991, Christopher Wong Won, Mark Ross, David Hobbs, and Luther Campbell entered into three separate Exclusive Recording Agreements with Luke Records, which transferred all of their copyright rights to 2 Live Crew's Subject Albums to Luke Records.  [ECF 1-2 (Ex. A); ECF 31 at 2–3].  These agreements (the "1991 Agreements") consisted of:

1. Exclusive Recording Agreement dated February 1991, between Luke Records and Luther Campbell;

2. Exclusive Recording Agreement dated April 1991, between Luke Records and Chris Wong Won; and

3. Exclusive Recording Agreement dated April 1991, between Luke Records and Mark Ross and David Hobbs.

[ECF 1-2 (Ex. A); ECF 31 at 2–3].

In each of the 1991 Agreements, the artists ***explicitly acknowledged that their sound recordings were works for hire***, as set forth in Section 5(c) of each agreement. [ECF 1-2 (Ex. A); ECF 31 at 2–3].  Additionally, each of the 1991 Agreements contained specific transfer language in Section 20(a) stating:

> ARTIST hereby sell, transfers and assigns to COMPANY irrevocably all right, title and interest in and to the masters embodying ARTISTS' performances the titles of which are listed on Schedule 'A' annexed hereto and made a part hereof, from the inception of recordings thereof... including, without limitation, the COMPANY'S (or its designee's) name as employer-for-hire such copyrights and all renewals and extensions thereof, perpetually and throughout the Territory.

[ECF 252-1 at 17; ECF 252-2 at 15; ECF 252-3 at 15; ECF 284 at 10–11].

4

Section 20(b) of the 1991 Agreements further provided: "ARTIST will facilitate the Masters to COMPANY ... simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY." *Id.* And Section 20(c) stated: "The Masters will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement." *Id.*

Attorney Allen Jacobi, who drafted the 1991 Agreements, testified that these agreements were intended to transfer to Luke Records all works 2 Live Crew had "ever made," including works created before the 1991 Agreements. [ECF 284 at 11]. He testified that "Schedule A" to the 1991 Agreements identified all of 2 Live Crew's prior recordings as part of what the 1991 Agreements transferred. [ECF 284 at 12–13].

### C.  The Purported 1990 Agreement.

During litigation, the Defendants (heirs of Wong Won and Ross, as well as Luther Campbell) produced a Recording Agreement between Luke Records and the members of 2 Live Crew, purportedly executed in or around 1990 (the "1990 Agreement"), which they claimed memorialized a prior oral agreement that transferred the copyrights to the Subject Albums. [ECF 250-1; ECF 37 at 4]. The undated 1990 Agreement expressly stated that its term was only from January 1 through December 31, 1987 (ECF 250-1 at 1; ECF 284 at 8), but none of the Subject Albums were recorded during that initial January 1 through December 31, 1987 term. [ECF 284 at 8]. The first album, "The 2 Live Crew is What We Are" was recorded and released in 1986, prior to the term of the 1990 Agreement. [ECF 274

5

at 224]. The remaining four albums were released after the term of the 1990 Agreement had expired. [*See* ECF 12-1 at 5–8].[1]

The 1990 Agreement did not contain any language transferring any sound recording copyrights, let alone the Subject Albums. [ECF 250-1; ECF 276 at 125; ECF 204 at 46–47]. To the contrary, in Section 2(d), it provided that the copyrights belonged to Luke Records from the inception of their creation:

> [Luke Records] shall own all master recordings embodying the performance of Artist made hereunder and all derivatives of the same; and Company shall further own all of the performances of Artist embodied in said master recordings and derivatives thereof. Without limiting the generality of the forgoing, [Luke Records'] said rights of ownership shall include the sole and exclusive right to manufacture, advertise, sell, lease, license or otherwise use, deal in or dispose of records embodying the performances of Artist to be recorded hereunder in all fields of use perpetually and throughout the world and upon terms and conditions as [Luke Records] may approve; and the sole and exclusive right publicly to perform Artists performances embodied in recordings hereunder by means of radio broadcasting or otherwise and to license and authorize others to do so perpetually and throughout the world upon such terms and conditions as [Luke Records] may approve. All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall from the inception of their creation, be entirely and forever the property of [Luke Records], or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist.

---

[1] Although the 1990 Agreement contained a mechanism to expand its term by "sending Artist a notice," there was no evidence that such notice was ever sent. [ECF 250-1 at 1, §1; ECF 284 at 8–9]. In fact, Mark Ross testified that he could not recall receiving any such notice. [ECF 300-1 at 49; ECF 204 at 48; ECF 284 at 8–9].

[ECF 250-1 at 3–4 (emphasis added); ECF 284 at 7].

Moreover, the "GRANT OF RIGHTS" section of the 1990 Agreement (Section 3) only granted rights to use the artists' name and likeness, not any rights to sound recordings or copyrights, let alone the Subject Albums:

> Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, publish and permit others to use and publish, and licenses and authorize the use of Artists name, including any professional name, likeness, signature and biographical data about Artist on and in connection with the manufacture, advertising, sale, lease and other exploitation in all fields of use throughout the world, of records..."

[ECF 250-1 at 4; ECF 284 at 8].

The 1990 Agreement also contained an integration clause stating, "[t]his agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof ...." [ECF 250-1 at 22; ECF 284 at 8].

Allen Jacobi, the attorney who drafted the 1991 Agreements, testified he had no knowledge of a 1990 Agreement and that there would have been no reason to prepare the 1991 Agreements if a 1990 Agreement existed. [ECF 284 at 6]. And Joseph Weinberger, who served as Luke Records' in-house counsel, similarly testified he wasn't aware of a 1990 Agreement during his tenure. [ECF 284 at 6].

At one point, Christopher Wong Won made a demand on Luke Records for monies he believed he was owed pursuant to the 1991 Agreement, not the 1990 Agreement. [ECF 276 at 19; ECF 252-28, 252-29]. His son testified that he found his father's signed 1991 Agreement among his father's documents. [ECF 277 at 148]. None of the Defendants testified they had the 1990 Agreement in their files.

### D.   Joseph Weinberger Joined Luke Records as CFO.

Joseph Weinberger joined Luke Records in 1991 as its Chief Financial Officer and in-house lawyer.  [ECF 274 at 161–170].  In that role, he had access to and reviewed Luke Records' business records during an IRS audit, among other responsibilities. [ECF 274 at 171–180].  During an IRS audit, Weinberger provided documentation confirming that the members of 2 Live Crew were employees of the label.  [ECF 274 at 189–191].  The IRS audit confirmed that Luke Records paid all recording costs and that the members of 2 Live Crew participated in employee-only benefit plans, including pension, health insurance, and workers' compensation. [ECF 275 at 15–21].  And Campbell, Christopher Wong Won and Mark Ross were paid salaries from which taxes were withheld.  [ECF 252-15;  ECF 252-16;  ECF 252-17;  ECF 252-18;  ECF 252-19].

During his time at Luke Records, Weinberger developed a working relationship with Luther Campbell and the members of 2 Live Crew.  [ECF 275 at 83–88].  Weinberger never saw or worked with the purported 1990 Agreement, despite his extensive knowledge of the label's business operations, including its contracts, tax filings, and employee records.  [ECF 276 at 125].

### E.   The Bankruptcies and Transfer of Copyright Ownership.

On March 28, 1995, Luke Records became the subject of an involuntary Chapter 7 bankruptcy petition filed by its creditors in the U.S. Bankruptcy Court for the Southern District of Florida.  [ECF 31 at 4–5; ECF 210 at 2].  On June 12, 1995, Luther Campbell individually filed a voluntary Chapter 11 bankruptcy petition and

converted the Luke Records bankruptcy into a voluntary Chapter 11 proceeding, with the two estates jointly administered.  *Id.*  [ECF 210 at 2–3].

On March 22, 1996, the Bankruptcy Court entered an order confirming the sale of the debtors' assets to Lil' Joe Records, Inc. ("Lil' Joe") and its president, Joseph Weinberger, "pursuant to the terms of the Plan and the Letter of Intent" and 11 U.S.C. § 363 (the "Confirmation Order").  [ECF 32-3 at 10–11; ECF 210 at 3].

The Letter of Intent provided that all copyright rights to 2 Live Crew's music and compositions and all trademark rights in 2 Live Crew's marks and cover designs, including, but not limited to, the Subject Albums, were transferred to Lil' Joe and Weinberger "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind."  [ECF 1-3 at 3;  ECF 31 at 4].  Under the Confirmation Order adopting the Letter of Intent, Luke Records and Campbell were to receive "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters or compositions."  *Id.*  Additionally, Lil' Joe and Weinberger were released from "claim[s] for royalties to be paid in the future, as a result of this transfer."  [ECF 1-3 at 16; ECF 31 at 4].

The Bankruptcy Court specifically found that "[t]he sale of the Debtors' assets to Joseph Weinberger and Lil' Joe Records, Inc. (together, 'Weinberger') pursuant to the terms of the Plan and the Letter of Intent is in the best interest of each of the Debtors' estates," that "Weinberger is an independent third-party purchaser and the Letter of Intent was negotiated in good faith and at arms-length," and that "Weinberger [is a] good faith purchaser[] as that term is used in 11 U.S.C. §363(m)

9

and [is] entitled to all of the protection of a good faith purchaser pursuant thereto." [ECF 252-20 at 2–3; ECF 284 at 16, n.23].

Notably, Christopher Wong Won, Mark Ross, and David Hobbs did not file any claims in the Luke Records bankruptcy asserting that they owned or were entitled to any rights appurtenant to any of the 2 Live Crew copyrights transferred to Lil' Joe and Weinberger. [ECF 31 at 4–5; ECF 210 at 3]. Nor did any of the 2 Live Crew members seek review of the bankruptcy order.

**F. The Ross Bankruptcy and Wong Won Settlement.**

On November 22, 2000, Mark Ross filed for bankruptcy in the U.S. Bankruptcy Court for the Northern District of Alabama. [ECF 31 at 5–6; ECF 210 at 3-4]. During that bankruptcy, Ross settled a claim brought by Lil' Joe (the "Ross Settlement Agreement"). *Id*. In the Ross Settlement Agreement, Ross acknowledged that other than writer's performance rights (not at issue here), he "has no rights (master or publishing) to any previous recordings owned by Lil' Joe and Lil['] Joe Wein Music, Inc. and The 2 Live Crew name which were previously owned by Luther Campbell and Luke Records" and "has no rights (master or publishing) in any other recordings owned by Lil' Joe." [ECF 32-6 at 5; ECF 31 at 5–6; ECF 210 at 3-4].

In 2002, Weinberger sued Christopher Wong Won. [ECF 31 at 5; ECF 210 at 4]. In settling the claims against him, Wong Won agreed that Lil' Joe and Lil' Joe Wein Music, Inc. "own all right, title and interest to all copyrights and trademarks previously conveyed to them in the bankruptcy of Luke Records and Luther

10

Campbell," released "any claims whatsoever to those works," and agreed that Wong Won "has no further claims to any royalties to any of the works owned by" Lil' Joe (the "Wong Won Settlement Agreement").  [ECF 32-4; ECF 31 at 5; ECF 210 at 4]. Separately, Wong Won released Lil' Joe and Weinberger from, among other things, "[a]ll royalties, profits and other monies or payments at any time, directly or indirectly, due or to become due," and "[a]ll rights to sue for infringements." [ECF 32-5 at 2; ECF 31 at 5; ECF 210 at 4].

### G.   The Termination Notice and Litigation.

On November 4, 2020, Luther Campbell, Mark Ross, and the heirs of Christopher Wong Won (collectively "Defendants") served a notice purporting to terminate the copyright grants in the Subject Albums pursuant to 17 U.S.C. § 203 (the "Termination Notice").  [ECF 12 at 15;  ECF 31 at 6;  ECF 210 at 6–7].  The fourth member of 2 Live Crew, David Hobbs, did not join the termination notice.

The Termination Notice identified the specific grant being terminated as the "[g]rant to [Luke] Records, Inc. titled 'Recording Agreement,' granted January 1, 1987, undated, and executed by Clients"—referring to the 1990 Agreement. [ECF 53-5 at 5–8; ECF 210 at 7].

The Termination Notice did not mention or seek to terminate transfers or grants made pursuant to the 1991 Agreements or any subsequent grants.  *Id.*

On October 21, 2021, Lil' Joe filed a Complaint against the Defendants seeking declaratory judgment as to the validity of the Termination Notice and asserting trademark and copyright infringement claims.  [ECF 1].  The Defendants

11

filed a Counterclaim seeking a declaration that they own the relevant rights, had the ability to terminate the transfers, and effectively served the Termination Notice. [ECF 12].

## II.    COURSE OF PROCEEDINGS.

### A.    Complaint.

Lil' Joe filed a ten-count complaint against the defendants, including former members of the rap group 2 Live Crew and the heirs of deceased member Christopher Wong Won.   [ECF 1].   The complaint's primary count sought declaratory judgment regarding the validity of defendants' copyright termination notice under 17 U.S.C. § 203.  Lil' Joe alleged that Defendants improperly attempted to terminate copyright transfers for five 2 Live Crew albums, contending that:

(1)  Luther Campbell and Mark Ross had lost their termination rights through bankruptcy proceedings [ECF 1 at 3–5];

(2)  Ross and Wong Won had relinquished their termination rights in settlement agreements with Lil' Joe [ECF 1 at 4–5];

(3)  the 2 Live Crew members were "artists for hire" and therefore held no termination rights [ECF 1 at 3]; and

(4)  the termination notice was ineffective as a matter of law because it failed to identify the operative transfers [ECF 1 at 5–6].

The complaint also asserted trademark and copyright infringement claims (Counts II-X) against the Wong Won heirs and Mark Ross for using "2 Live Crew" trademark and copyrighted works without Lil' Joe's consent.  [ECF 1 at 7–17].

12

### B. Answer and Counterclaim.

Defendants filed an Answer and Counterclaim, denying the substantive allegations of Lil' Joe's complaint, and they asserted 21 affirmative defenses—including fair use, unclean hands, failure to mitigate damages, laches, statute of limitations, invalidity of the copyright and trademark registrations, and lack of ownership rights. [ECF 12 at 1–12]. The Defendants contended that their notice of termination under § 203 of the Copyright Act was valid and legally sufficient to reclaim their copyright interests in the Subject Albums. [ECF 12 at 13–14].

The Counterclaim sought declaratory judgment confirming Defendants' rights to terminate the copyright transfers under § 203. Defendants alleged they properly served the termination notice on November 4, 2020, with the terminations to become effective on the dates specified in the notice. [ECF 12 at 14-15]. They asserted that the termination rights were inalienable and could not have been transferred or waived in any prior proceedings, emphasizing § 203(a)(5)'s provision that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." [ECF 12 at 15]. The Counterclaim requested declaratory relief confirming the validity of their termination notice, an accounting of monies collected by Lil' Joe, and injunctive relief to prevent Lil' Joe from bringing infringement actions against them. [ECF 12 at 16–17].

Defendants maintained that they had validly exercised their termination rights under § 203 of the Copyright Act to reclaim ownership of their sound recording copyrights. [ECF 12 at 14–15]. Specifically, defendants argued that their November 4, 2020 notice properly identified the 1990 Agreement as the operative grant being

13

terminated, which they claimed had memorialized a prior oral agreement transferring copyrights for the Works at issue.  [ECF 12-1 at 5–7].

Defendants further alleged they were not "artists for hire" when creating the Works, but rather independent contractors, making the Works eligible for termination under § 203.  [ECF 12-1 at 4–7].

### C.  The Cross-Motions for Summary Judgment.

#### (1) Lil' Joe's Motion for Partial Summary Judgment.

Lil' Joe moved for partial summary judgment on Count I (declaratory relief), asserting that no genuine issues of material fact existed regarding the validity of defendants' termination notice.  [ECF 30 at 1–2].  The motion argued that the notice was ineffective as a matter of law for four primary reasons:

(1)  Luther Campbell, Luke Records, and Mark Ross lost their termination rights when they filed for bankruptcy, as these intangible rights became part of the bankruptcy estates and were never abandoned back to the debtors [ECF 30 at 7–9];

(2)  Luther Campbell and Mark Ross released their rights through Federal law (Bankruptcy Court orders), and Wong Won through state law (settlement agreement compromising claims) thereby extinguishing their ability to terminate any transfers [ECF 30 at 9–11];

(3) the 2 Live Crew members were "artists for hire" when they created the works, making the sound recordings "works made for hire" ineligible for termination under § 203 [ECF 30 at 11–14];

14

(4) the termination notice failed to identify all relevant grants, including the 1991 Agreements which Lil' Joe contended were the operative transfers [ECF 30 at 5–7].

Central to Lil' Joe's position was the contention that the 1990 Agreement—the only transfer identified in the termination notice—contained no grant of sound recording copyrights and merely referred to name and likeness rights. [ECF 30 at 5–7]. Lil' Joe further argued that bankruptcy proceedings transferred the copyrights at issue to Lil' Joe "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind," and that these bankruptcy court-approved transfers were made under federal bankruptcy law (11 U.S.C. §363), which § 203(b)(5) expressly exempts from termination. [ECF 30 at 8–9, 16–17]. The motion concluded that the termination notice was null and void as a matter of law, warranting judgment in Lil' Joe's favor on Count I. [ECF 30 at 17].

### (2) Defendants' Cross-Motion for Summary Judgment

Defendants cross-moved for summary judgment, arguing that the undisputed material facts established their right to terminate the copyright transfers under 17 U.S.C. § 203. [ECF 53]. Defendants contended that the copyright termination notice was valid as a matter of law because: (1) the 1990 Agreement was the operative grant transferring rights to the sound recordings at issue, as it memorialized a prior oral agreement and predated the 1991 Agreements; (2) the notice properly identified this grant and the works being terminated; and (3) they possessed valid termination rights as the original authors and heirs. [ECF 37 at 4–5]. The motion directly

challenged Lil' Joe's assertion that the 2 Live Crew members were "artists for hire," citing multiple copyright registrations for the works at issue that specifically designated their contributions as "not works made for hire," evidence of their creative independence, and the absence of traditional employment relationships. [ECF 37 at 6–7].

Defendants reasserted their position that termination rights under § 203 are inalienable and cannot be divested through bankruptcy proceedings or settlement agreements, based on the statutory language that termination "may be effected notwithstanding any agreement to the contrary." [ECF 36 at 7–11]. They maintained that termination rights do not vest until the statutorily prescribed timeframe and thus could not have been transferred as part of any bankruptcy estate. [ECF 36 at 9–10]. Defendants further argued that Lil' Joe's infringement claims (Counts II-X) failed as a matter of law because defendants held superior rights to use the trademarks and copyrights at issue, particularly after the effective dates of termination set forth in their notice. [ECF 36 at 17–18].

### (3) Order On Cross-Motions for Summary Judgment

The district court entered its order on the cross-motions for summary judgment, ruling that genuine issues of material fact existed over (i) whether the members of 2 Live Crew were "artists for hire," (ii) which agreement (1990 or 1991) transferred the copyrights, and (iii) whether the termination notice was invalid for failing to specifically identify other grants. [ECF 210 at 14–18].

16

On Lil' Joe's argument that the Campbell and Ross bankruptcies divested those Defendants of their rights to terminate the copyright grants, the district court ruled that such rights under § 203 were "inalienable" personal rights like spousal maintenance, not property rights that are subject to the bankruptcy estate. [ECF 210 at 19–23].[2]

The case proceeded to trial.

### D.  Trial.

#### (1) Witness Testimony.

**JOSEPH WEINBERGER**
**(LIL' JOE'S PRESIDENT AND**
**FORMER CFO/IN-HOUSE COUNSEL FOR LUKE RECORDS)**

Joseph Weinberger testified:

- Luke Records paid all recording costs and 2 Live Crew members received employee benefits including pension, health insurance, and workers' compensation [ECF 275 at 11–21],

- An IRS audit confirmed the group members were employees, not independent contractors [ECF 275 at 171–180],

- He never saw or worked with any 1990 Agreement during his time at Luke Records [ECF 276 at 125],

---

[2] The district court also entered judgment against Lil' Joe on its trademark and copyright infringement claims. [ECF 210 at 28-29].

17

- By 1990, the copyrights' value was well-established, with Atlantic Records providing a $5 million advance for distribution of the subject albums [ECF 276 at 119–120].

### LUTHER CAMPBELL
### FORMER 2 LIVE CREW MEMBER AND LUKE RECORDS OWNER

Luther Campbell testified:

- Between 1986 and 1990, "the label own[ed] the subject album copyrights" [ECF 277 at 17],

- He covered recording costs with "a clear understanding that the company would own the copyrights" [ECF 277 at 16–17],

- The 1990 Agreement allegedly memorialized a prior verbal agreement [ECF 277 at 21–30].

### MARK ROSS
### FORMER 2 LIVE CREW MEMBER

Designations of Mark Ross's deposition were introduced [ECF 204], in which he testified:

- He could not identify where the 1990 Agreement mentioned copyrights being transferred [ECF 300-1 at 47–48],

- He could not recall receiving notice extending the 1990 Agreement's term [ECF 300-1 at 48].

### (2) Lil' Joe's Motion for Judgment as a Matter of Law

During trial, Lil' Joe moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), arguing the Defendants' termination notice was invalid as a matter of law. [ECF 251].

*First*, Lil' Joe argued that the termination notice was ineffective because it identified only the 1990 Agreement as the operative transfer instrument, but this agreement contained no language granting copyright rights to the Subject Albums. Instead, the 1990 Agreement's express language established that Luke Records "shall own all master recordings" from "the inception of their creation," indicating the label already owned the copyrights rather than acquiring them through transfer. [ECF 251 at 5–7].

*Second*, Lil' Joe contended that even if the 1990 Agreement was operative, the termination notice failed to identify subsequent transfers, including the 1991 Agreements and later grants by Campbell (1996), Ross (2001), and Wong Won (2003). Lil' Joe argued this failure rendered the termination notice null and void under 17 U.S.C. §203 and 37 CFR §201.10, which require clear identification of the grant being terminated. [ECF 251 at 4–6, 8–9].

*Third*, Lil' Joe asserted that the Subject Albums constituted "works made for hire" because the 2 Live Crew members were employees of Luke Records, citing evidence including employee payroll records, tax documentation, pension plan participation, and copyright registrations designating the works as "made for hire." [ECF 251 at 9–15]. Lil' Joe argued that as works made for hire, the sound recordings were not subject to termination under 17 U.S.C. §203(a). [ECF 251 at 9].

19

*Finally*, Lil' Joe reiterated its argument that the bankruptcy court-ordered transfer of copyrights to Lil' Joe "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind" under 11 U.S.C. §363 could not be affected by termination rights under 17 U.S.C. §203(b)(5), which exempts "rights arising under any other Federal, State, or foreign laws" from termination. [ECF 251 at 16-19].

The district court denied the motion.

### (3) Jury Verdict

The jury returned a verdict finding that the 2 Live Crew members were not employees under a work for hire contract with Luke Records and that the 1990 Agreement (not the 1991 Agreements) transferred the sound recording copyrights. [ECF 255].

### E. Post-Trial Motions.

### (1) Renewed Motion for Judgment as a Matter of Law

Following the jury verdict, Lil' Joe Records filed a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), alternatively seeking a new trial under Rule 59(a) and Rule 60(b). [ECF 284].

*First*, Lil' Joe contended that no legally sufficient evidence supported the jury's finding that the 1990 Agreement transferred the sound recording copyrights because the Agreement's plain language contained no grant or transfer of copyright ownership, but instead expressly stated that Luke Records "shall own all master recordings" from "the inception of their creation," indicating that the copyrights

were never owned by the Defendants in the first place. [ECF 284 at 5–9]. And, the "GRANT OF RIGHTS" section of the Agreement only granted rights to use the artists' name and likeness, not sound recordings or copyrights. [ECF 284 at 8].

*Second*, Lil' Joe argued that the 1990 Agreement could not have memorialized any prior oral transfer of copyright ownership, as Defendants claimed, because the Agreement's plain terms failed to reference or describe the prior alleged grants. [ECF 284 at 8, 30]. Lil' Joe further argued that the Agreement's integration clause precluded any consideration of prior oral agreements or grants. [ECF 284 at 8]

*Third*, Lil' Joe asserted that the Termination Notice was defective because it failed to identify subsequent grants, including Campbell's grants in 1996 to Lil' Joe and Ross's grant in 2001 to Lil' Joe through the bankruptcy proceedings, and Wong Won's grant in 2003 through state court proceedings, which would render the notice ineffective as to those grants. [ECF 284 at 27-28].

### (2) Order Denying Post-Trial Motions.

The district court summarily denied Lil' Joe's renewed motion for judgment as a matter of law and alternative motion for new trial. [ECF 305]. This timely appeal followed.

21

# STATEMENT OF THE STANDARD OF REVIEW

### SUMMARY JUDGMENT

The district court's denial of summary judgment on the issue of whether Luke Campbell and Mark Ross transferred their rights to terminate the copyright grants during the bankruptcy proceedings is reviewed de novo, as it presents pure questions of law.

The Court of Appeals reviews "the district court's grant of summary judgment de novo, applying the same legal standards as the trial court." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1333 (11th Cir. 2003); *accord Steward v. Champion Int'l Corp.*, 987 F.2d 732, 734 (11th Cir. 1993). "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re Optical Techs., Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### JUDGMENT AS A MATTER OF LAW

At the conclusion of trial, Lil' Joe renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing that the Defendants had not provided evidence to support their § 203 termination claim. [ECF 284]. The trial court summarily denied the motion for renewed judgment as a matter of law. [ECF 305].

The standard for granting a motion for judgment as a matter of law is whether there is a legally sufficient evidentiary basis for a reasonable jury to find for the non-

moving party.  Fed. R. Civ. P. 50(a).  The Circuit Court of Appeals reviews "de novo a district court's grant of judgment as a matter of law under Rule 50, applying the same standards as the district court."  *Cobb v. TSI Telcoms. Servs.*, 172 F. App'x 293, 294 (11th Cir. 2006) (emphasis added).

Moreover, "[c]ontract interpretation is a legal question subject to de novo review by this Court." *GOT I, LLC v. XRT, Inc.*, 798 F. App'x 505, 509 (11th Cir. 2020) (citation and quotation marks omitted).

## SUMMARY OF ARGUMENT

### TERMINATION RIGHTS
### WERE INCLUDED IN THE BANKRUPTCY ESTATES

The district court erred in ruling that copyright termination rights are exempt from bankruptcy proceedings as inalienable rights.  Under 11 U.S.C. § 541 (2024), every conceivable interest of the debtor, including future, contingent, and unvested rights, becomes property of the bankruptcy estate upon filing.  Multiple courts have confirmed that unvested property rights, such as stock options, insurance claims, and trust interests, become part of the bankruptcy estate.  Neither the Bankruptcy Code nor the Copyright Act contains any explicit exemption for termination rights from creditor process.  Campbell's and Ross's termination rights were therefore transferred to their respective bankruptcy estates, where they remained.  Summary judgment should be reversed and judgment entered in Lil' Joe's favor on remand.

### THE 1990 AGREEMENT'S PLAIN TERMS
### DID NOT TRANSFER THE COPYRIGHTS

The district court erred in denying judgment as a matter of law because the 1990 Agreement—the only agreement identified in Defendants' Termination Notice—contains no language transferring copyright ownership.  The agreement's plain language—to the contrary—acknowledges that Luke Records already owned the sound recordings "from the inception of their creation" and contains only a grant of name and likeness rights, not a transfer of copyrights.  Additionally, the Termination Notice was defective for failing to identify subsequent grants, including the 1991 Agreements and the later grants by Campbell, Ross, and Wong Won in 1996, 2001, and 2003, which render the notice ineffective.

24

## ARGUMENT

## I. THE DEFENDANTS' TERMINATION RIGHTS WERE TRANSFERRED TO THE BANKRUPTCY ESTATE.

The district court denied Lil' Joe's motion for summary judgment on its declaratory judgment claim seeking to declare the termination rights invalid. [ECF 210]. Lil' Joe argued Campbell and Ross's termination rights became part of their respective bankruptcy estates and were never abandoned back to the debtors. [ECF 30 at 7–11]. Acknowledging that Lil' Joe's argument presented a question of first impression, the district court nonetheless disagreed with Lil' Joe and ruled that the termination rights were non-transferable and inalienable, such that they never became part of the bankruptcy estate. [ECF 210 at 18]. The district court's ruling ignored the plain language of, and long-standing precedent on, § 541 of the Bankruptcy Code.

" 'When a bankruptcy petition is filed, virtually all property of the debtor at that time becomes property of the estate. … [E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of 11 U.S.C. § 541.' " *In re Dittmar*, 618 F.3d 1199, 1207 (10th Cir. 2010) (quoting *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993)). "[T]he scope of § 541 is broad and should be generously construed, and … an interest may be property of the estate even if it is 'novel or contingent.' " *In re Dittmar*, 618 F.3d at 1207. *Accord In re Mortg. Am. Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983) (emphasizing that § 541(a)(1) "is all-encompassing, and Congress meant for it to be construed commensurately").

25

To be excluded from the bankruptcy estate under § 541, there must be evidence that Congress intended the statute at issue to serve as a general exemption from creditor process. Put differently, all of a debtor's assets except those explicitly excluded in 11 U.S.C. § 541(b) & (c) are included in the debtor's bankruptcy estate.

The right to terminate under § 203 of the Copyright Act is ***not*** expressly excluded in 11 U.S.C. § 541.

Indeed, the right to terminate copyright transfers is a "legal … interest[] of the debtor in property" — *i.e.*, the copyrights themselves. 11 U.S.C. § 541(a)(1). That is, the Bankruptcy Code defines "intellectual property" as "work[s] of authorship protected under title 17," the Copyright Act. 11 U.S.C. § 101(35A)(E) (2024). Under the Bankruptcy Code, therefore, the right to terminate copyright grants is an intangible legal interest of the debtor in a "work of authorship" that becomes part of the bankruptcy estate upon the initiation of bankruptcy proceedings.

To be sure, the Copyright Act provides that "[t]ermination of the grant may be effected notwithstanding any ***agreement*** to the contrary," but initiating a bankruptcy proceeding under Federal law is ***not entering into an agreement***. 17 U.S.C. § 203(a)(5) (2024) (emphasis added). *See In re: Bilzerian*, 264 B.R. 726, 733-34 (Bankr. M.D. Fla. 2001) (explaining that bankruptcy is not an "agreement" but a voluntary process in which the debtor obtains the *quid pro quo* of a "fresh start" in exchange for turning over all of his non-exempt property for the benefit of his creditors).[3]

---

[3] The Copyright Act in 17 U.S.C. § 201(e) (2024) accordingly, expressly, contemplates and carves out of its reach transfers by operation of law undertaken by

(continued . . .)

Moreover, Lil's Joe's copyrights emanate from a sale approved by a bankruptcy court order and a settlement under the bankruptcy proceedings—both governed by the Bankruptcy Code, *not* agreements or contracts pursuant to the Copyright Act. For that additional reason, § 203 does not apply by its plain terms to Lil' Joe's copyrights, as that section provides that "[t]ermination of a grant under this section affects *only those rights covered by the grants that arise under this title*, and in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 203(b)(5) (emphasis added). Lil's Joe's rights arise under the Bankruptcy Code, *i.e.*, "Federal … laws." *Id.*

Thus, in the absence of an express provision in the Bankruptcy Code or Copyright Act excluding the right to terminate copyright transfers from the bankruptcy estate, the broad general rule of § 541(a) of the Bankruptcy Code, when read in concert with § 203(b)(5) of the Copyright Act excluding transfers by Federal and state law, must supersede § 203(a).

The mere fact that these rights were unvested or contingent on a future occurrence (here, vesting through the passage of time), does not change their status as property subject to the bankruptcy process. *See Camp v. St. Paul Fire & Marine Ins. Co.*, 616 So. 2d 12, 15 (Fla. 1993) ("Whatever claim—including potential and

---

the power of the bankruptcy court, so that "an interest of the debtor in property becomes property of the estate … notwithstanding any provision in … applicable nonbankruptcy law … that restricts or conditions transfer of such interest by the debtor…." 11 U.S.C. § 541(c)(1)(A). And therefore, the transfer restriction in § 203 of the copyright act ("applicable nonbankruptcy law … that restricts or conditions transfer of such interest by the debtor") does not prevent a debtor's interest in a § 203 termination right from becoming an asset of its bankruptcy estate.

contingent claims—that the bankrupt owns at the time of his petition becomes a part of his estate, with the title thereto vested in the trustee.").

In this way, termination rights are akin to potential claims or causes of action. And it is well-established that a debtor's assets include potential legal causes of action. *In re Icarus Holding, LLC*, 391 F.3d 1315, 1319 (11th Cir. 2004). "Even if not disclosed by the debtor during the bankruptcy proceeding, the property of the bankruptcy estate includes causes of action and potential causes of action belonging to the debtor at the commencement of the bankruptcy case." *Calderon v. U.S. Bank Nat'l Ass'n*, 860 F. App'x 686, 687 (11th Cir. 2021) (citations and quotation marks omitted). "The bankruptcy trustee is the only party with standing to prosecute causes of action belonging to the estate. Even after the close of a bankruptcy case, property of the bankruptcy estate remains in the estate unless abandoned back to the debtor under 11 U.S.C. § 554." *Calderon*, 860 F. App'x at 687–88 (citation and quotation marks omitted).

Many other types of unvested property rights have been found to be property of the bankruptcy estate, even if only accruing after a bankruptcy petition:

- Unvested stock options/stock appreciation rights. *In re Allen*, 226 B.R. 857, 866 (Bankr. N.D. Ill. 1998) ("The Debtor's contract rights … whether then vested or contingent, became property of the estate under § 541(a)(1) on the petition filing date, January 10, 1997."); *In re Wick*, 276 F.3d 412, 415 (8th Cir. 2002) ("A contingency is no bar to property interest becoming property of the bankruptcy estate, even if the contingency requires additional post-petition services, and even if the right to

enjoyment of the property may be defeated."); *Denadai v. Preferred Cap. Mkts.*, 272 B.R. 21, 28 (D. Mass. 2001) ("[D]ebtors have a contingent contractual interest in options that are unvested as of the petition date, and that the contingent interest is property of the estate subject to the contingency"); *In re Dittmar*, 618 F.3d at 1205 ("Even contingent interests that may or may not vest for years at the time of their creation are not necessarily excluded.").

- Loss-carry back tax refunds. *Segal v. Rochelle*, 382 U.S. 375, 380 (1966).

- Potential personal injury and workers compensation claims. *In the Matter of Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992).

- Insurance "bad-faith" claims. *Field v. Transcon. Ins. Co.*, 219 B.R. 115, 119 (E.D. Va. 1998).

- Contingent/unvested interests in trusts. *In re Dias*, 37 B.R. 584, 587 (Bankr. D. Idaho 1984). *In re Smith*, 189 B.R. 8, 10–11 (N.D. Ill. 1995); *In re Neuton*, 922 F.2d 1379, 1382 (9th Cir. 1990).

The contingent nature of the termination rights did not render them inalienable through bankruptcy.

Additionally, the district court's alternative rationale for why the termination rights were inalienable, analogizing them to alimony and spousal maintenance that "are personal to the author, as no other party may exercise them" is simply wrong. [*See* ECF 210 at 22].  Unlike spousal maintenance rights, § 203 termination rights are, indeed, exercisable by other parties—they are ***expressly*** transferable and inheritable as per subsection 203(a)(2):

29

Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

> (A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

> (B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

> (C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

> (D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

17 U.S.C. § 203(a)(2).  That is precisely what occurred here.  Chris Wong Won and Mark Ross's heirs are pursuing their claims.

Not only that, but "[o]n its face and by its plain language, § 541(a)(5)(B) does not reach alimony awards."  *In re Jeter*, 257 B.R. 907, 910 (B.A.P. 8th Cir. 2001). Section 541(a)(5)(B) explicitly provides that a debtor's bankruptcy estate only includes property or any interest in property a debtor receives from a property settlement agreement or a final divorce decree within a certain time frame. 11 U.S.C. § 541(a)(5)(B).  Alimony is not property that comes to the debtor as part of a property settlement agreement or final divorce decree because "property

division is the equitable distribution of marital assets, while alimony represents spousal support and maintenance." *In re Jeter*, 257 B.R. 907. Alimony or spousal support is inalienable through bankruptcy because it is "most often rehabilitative and temporary in nature and designed to help a spouse bounce back financially from a divorce." *Id.* "Making such support payments property of the estate upon the petition filing would jeopardize the debtor spouse's fresh start and substantially interfere with, perhaps even undermine, the debtor spouse's ability to support himself or herself in the future." *Id.*; *see also In re Wise*, 346 F.3d 1239, 1242–43 (10th Cir. 2003); *In re Peterson*, 280 B.R. 886, 892 (Bankr. S.D. Ala. 2001). There is no such concern with copyright grants, which are expressly rights in intellectual property covered by § 541. The district court's analogy to spousal maintenance was erroneous as a matter of law, ignoring the language and operation of the Bankruptcy Code.

The bottom line here is that the district court's ruling contravenes the expansive scope of § 541 of the Bankruptcy Code, which encompasses "every conceivable interest of the debtor." *In re Dittmar*, 618 F.3d at 1207. Termination rights under the Copyright Act, while inalienable by ***contractual agreement***, are nonetheless legal interests in intangible property (copyrights) that, by operation of law, vest in the bankruptcy estate upon filing. The absence of an explicit statutory exclusion for these rights from bankruptcy estates, coupled with established precedent recognizing contingent and unvested interests as estate property, compels the conclusion that the termination rights at issue became part of the bankruptcy estates and remained there absent formal abandonment under § 554 of the

31

Bankruptcy Code (which is absent here). The district court's contrary determination disregards the plain statutory language of both § 203 of the Copyright Act and § 541 of the Bankruptcy Code, as well as the long line of consistent judicial interpretation favoring inclusion of contingent interests in bankruptcy estates.

Campbell and Ross relinquished their termination rights through the bankruptcy process. Section 203(a)(1) of the Copyright Act requires that "termination of the grant may be effected by a majority of the authors who executed it." 17 U.S.C. § 203(a)(1). With four original members of 2 Live Crew (Campbell, Ross, Wong Won, and Hobbs), a valid termination notice would require participation of at least three members (3/4 or 75%) to constitute a majority. But since Hobbs did not join the termination notice, and both Campbell and Ross had lost their termination rights through bankruptcy, the remaining signatory (Wong Won, through his heirs) represents only 25% of the original authors, short of the majority required by statute. The termination notice was ineffective.

Accordingly, this Court should reverse the denial of summary judgment, hold that the termination rights were validly transferred through the bankruptcy proceedings but never abandoned, and reverse and remand for entry of summary judgment in Lil' Joe's favor.

## II. LIL' JOE WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE 1990 AGREEMENT VESTED OWNERSHIP IN THE COPYRIGHTS WITH LUKE RECORDS.

### A. The Plain Language of the 1990 Agreement Vested Initial Ownership of the Copyrights in Luke Records.

"Where a contract is clear and unambiguous, it must be enforced pursuant to its plain language," because "the language itself is the best evidence of the parties' intent, and its plain meaning controls." *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 986 (Fla. 2015).[4] "In the absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence." *Dirico v. Redland Estates, Inc.*, 154 So. 3d 355, 357 (Fla. 3d DCA 2014) (citation and quotation marks omitted).

"[C]ourts may not rewrite, alter, or add to the terms of a written agreement between the parties and may not substitute their judgment for that of the parties in order to relieve one from an alleged hardship of an improvident bargain." *Int'l Expositions, Inc. v. City of Miami Beach*, 274 So. 2d 29, 30–31 (Fla. 3d DCA 1973) (citation omitted). When a contract is clear and unambiguous, the court is not at liberty to give the contract any meaning beyond that expressed." *Dirico*, 154 So. 3d at 357 (citations and quotation marks omitted). *Accord Andersen Windows, Inc. v. Hochberg*, 997 So. 2d 1212, 1214 (Fla. 3d DCA 2008) ("Courts, without dispute, are not authorized to rewrite clear and unambiguous contracts.").

---

[4] Under Florida's choice-of-law rules, *lex loci contractus* applies in contract matters. *See Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1091 (11th Cir. 2004).

33

Assuming for purposes of argument that the 1990 Agreement is the operative agreement (not the subsequent 1991 Agreements), each of the members of 2 Live Crew, Campbell, Wong Won, Ross and David Hobbs, expressly and unambiguously agreed in paragraph 2(d) of that 1990 Agreement that **Luke Records owned the 2 Live Crew Copyrights at their inception**:

> [Luke Records] **shall own all master recordings** embodying the performance of Artist made hereunder and all derivatives of the same; and Company shall further own all of the performances of Artist embodied in said master recordings and derivatives thereof. Without limiting the generality of the forgoing, [Luke Records'] said rights of ownership shall include the sole and exclusive right to manufacture, advertise, sell, lease, license or otherwise use, deal in or dispose of records embodying the performances of Artist to be recorded hereunder in all fields of use perpetually and throughout the world and upon terms and conditions as [Luke Records] may approve; and the sole and exclusive right publicly to perform Artists performances embodied in recordings hereunder by means of radio broadcasting or otherwise and to license and authorize others to do so perpetually and throughout the world upon such terms and conditions as [Luke Records] may approve. All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall **from the inception of their creation, be entirely and forever the property of [Luke Records]**, or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist.

[ECF 250-1 at 3–4 (emphasis added).]

This language is clear that the Defendants never owned the Copyrights in the first place (Luke Records did "from inception"), and thus Defendants could not transfer, or subsequently terminate the transfer of, any such copyrights.

That is, § 201(a) of the 1976 Copyright Act provides that ownership "vests initially in the author or authors of the work," and where the creators of a work are operating under a contract for hire, "the employer or other person for whom the work was prepared is considered the author …, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights in the copyright." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) (quoting 17 U.S.C. § 201(b)).  A "work made for hire" is any "work prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101 (2024).

The contract language in *Warren* contained broad language similar to the 1990 Agreement here, stating that hiring company would "own in perpetuity, throughout the universe, solely and exclusively, all rights of every kind and character, in the musical material" created by the artist, and that the hiring company "shall be deemed the author thereof for all purposes."  328 F.3d at 1140.  In *Warren*, the Ninth Circuit held that such express language established a work-for-hire relationship.

Likewise, here, the 1990 Agreement contains comprehensive ownership language:  Luke Records "shall own all master recordings ... and all derivatives" and that all recordings "shall ***from the inception of their creation, be entirely and forever the property of***" Luke Records.  [ECF 250-1 at 3–4 (emphasis added)].  Moreover, the agreement's terms continue that Luke Records' rights are "free from any claims whatsoever by Artist."  *Id*.

This comprehensive grant of rights from inception of the works, like in *Warren*, establishes a work-for-hire relationship.

Further provisions of the 1990 Agreement confirm the employee/employer relationship. "When interpreting a contract, … [a] single term or group of words must not be read in isolation[,] [r]ather, the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Perez-Gurri Corp. v. McLeod*, 238 So. 3d 347, 350 (Fla. 3d DCA 2017) (citations and quotation marks omitted).

Paragraph 1 strongly suggests the Defendants were employees: Luke Records "hereby engages the ***exclusive services*** of Artists … for an initial period commencing on January 1, 1987 and ending December 31, 1987," with additional options to extend the contract on the same terms. [ECF 250-1 at 1 (emphasis added)]. The Defendants were not permitted to render their services to anyone else.

Paragraph 4 dictates the recording procedures and Luke Records' right to control and direct the creation of the works, the crucial consideration in determining whether artists created works on a work-for-hire basis. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 750 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's ***right to control*** the manner and means by which the product is accomplished." (emphasis added)). Luke Records maintained the right of complete control over every aspect of the works' creation under the 1990 Agreement:

- Defendants were to "report to recording sessions at the same times and places that [Luke Records] designates,"

- Defendants were obligated to "re-record any such 'material' until a commercially satisfactory master recording thereof is accepted by [Luke Records],"

- Defendants could submit "original material for consideration by [Luke Records] on each Album recording project hereunder; however, [Luke Records'] decision as to musical compositions used shall be final,"

- "Each Master Recording made hereunder shall be subject to [Luke Records'] approval,"

- Luke Records "shall edit, sequence, and leader multi-tract master tapes,"

[ECF 250-1 at 4–6].

Additionally, Luke Records was to be "responsible for, and shall pay when due, all Recording Costs." *Id*. at 6.

As for the Defendants' compensation, paragraph 6 provided that "[a]s **payment in full** for Artists services hereunder, [Luke Records] agrees to pay Artist within fourteen (14) days after services have been rendered, applicable minimum union scale for each Master Recording hereunder accepted by [Luke Records] as commercially satisfactory for manufacture and sale." *Id*. at 7.  And, Luke Records agreed to pay "the basic royalty computed at the applicable percentage indicated below" on any "Records sold by [Luke Records] or our Licensees." *Id*. at 8.  *See, e.g.*, *Muller v. Walt Disney Prods.*, 871 F. Supp. 678, 684 (S.D.N.Y. 1994) ("The 1939 contract strongly support's Disney's claims, in that it clearly contemplates work for hire, and explicitly reserves all rights in "Fantasia" to Disney.  Pursuant to paragraph nine, Disney paid Stokowski $ 125,000 for his work, which was to be

37

'*compensation in full*' for Stokowski's services, and for the rights he granted."
(emphasis added)).

Thus, viewing the 1990 Agreement in its entirety and giving voice to all provisions yields the inescapable conclusion that Luke Records employed the Defendants to produce works for hire as employees.

To be sure, the 1990 Agreement granted royalties to the Defendants; however, the "the payment of royalties was only one form of compensation given to [the Defendants] under the contract[]...[and] is not sufficient to overcome the great weight of the contractual evidence indicating a work-for-hire relationship." *Warren*, 328 F.3d at 1142.

Based on the 1990 Agreement's plain and unambiguous terms, the Defendants' works were made for hire. Luke Records owned the works from inception. Consequently, the termination provisions of 17 U.S.C. § 203 did not apply, as the Copyright Act explicitly excludes works made for hire from termination rights. Final Judgment should be reversed and judgment entered in Lil' Joe's favor on remand.

## B. The Trial Evidence Confirmed Defendants Were Artists for Hire.

The Court's analysis of the 1990 Agreement's unambiguous and clear plain language should end the discussion. Indeed, it "is only when a term in a [contract] is ambiguous or unclear that the trial court may consider extrinsic evidence as well as the parties' interpretation of the contract to explain or clarify the language." *White v. White*, 141 So. 3d 645, 646 (Fla. 4th DCA 2014). Absent that threshold showing

of ambiguity the parol evidence rule confined the district court's gaze to "the four corners of the document." *Teague v. Teague*, 122 So. 3d 938, 942 (Fla. 4th DCA 2013). *Accord J. C. Penney Co., Inc. v. Koff*, 345 So. 2d 732, 735 (Fla. 4th DCA 1977) (the parol evidence rule "bar[s] the consideration of any extensive [sic] evidence to explain or vary the express terms of a contract unless an ambiguity of a contract is first found to fairly appear"). The Defendants never established, and the district court never ruled, that the 1990 Agreement was ambiguous.

But even a cursory glance at the evidence adduced at trial supports the interpretation of the 1990 Agreement as a work-for-hire arrangement where Luke Records owned the copyrights from the start. Indeed, Luther Campbell himself conceded the fact:

> Q. Between 1986 and 1990, did the label own the subject album copyrights?
>
> A. Yes, sir.
>
> Q. Did the label sell and distribute the Subject Albums?
>
> A. Yes, sir.
>
> Q. Did the label split the money between the guys in the group, including you?
>
> A. Yes, sir.

[ECF 277 at 17]. And he admitted that Luke Records followed the 1990 Agreement by covering all costs of recording, entitling it to ownership of the music:

> I would pay for the studio because the guys were just coming out of the military and I was making money doing my teen disco parties, and that I would foot the bill for the studio and put the records out. We had a clear understanding that, you know, that the company would own the copyrights.

39

[ECF 277 at 16–17].

Moreover, the sound recording copyright registrations (ECF 252-7; ECF 252-8; ECF 252-9; ECF 252-10;  ECF 252-11;  ECF 252-12), and the copyright notices on the 5 albums (ECF 250-6;  ECF 250-14) (designated by Campbell), filed by Luke Records over a decade before termination of the copyrights was in question, each show Luke Records was the owner of the copyrights, which, of course, would only be accurate if the members were "artists for hire."

Campbell, Christopher Wong Won and Mark Ross were paid salaries from which taxes were withheld (ECF 252-15; ECF 252-16; ECF 252-17; ECF 252-18; ECF 252-19, ECF 252-20), which Luke Records' CFO and outside CPA testified is only done for employees.  And all the members of 2 Live Crew participated in pension plans and receipt of workers compensation insurance and health insurance (also only available to employees).  [ECF 275 at 15–21].

Thus, while the parol evidence rule barred consideration of extrinsic evidence on the meaning of the 1990 Agreement, the evidence nonetheless supports the conclusion that the Defendants were employees under a work for hire agreement, which agreement all parties intended would confer original copyright ownership on Luke Records, not the members of 2 Live Crew.[5]

---

[5] With no evidence supporting their theory of copyright ownership and transfer, the Defendants could only resort to improper invective at trial.  For example, at the beginning of closing argument, Defendants' counsel stated this was "a tale of deceit and dishonesty that wouldn't be out of place in a Netflix movie" wherein Defendants were "living the dream, until in 1991 when they were unfortunate enough to cross paths with Mr. Weinberger.  Mr. Weinberger *infected the group, infected the label like a virus*.  He destroyed it from within."  [ECF 278 at 56 (emphasis added)].  And

(continued . . .)

**C. The 1990 Agreement Was Not a Valid Transfer of Copyrights Because It Did Not Reference Any Alleged Prior Oral Agreements.**

Even assuming for purposes of argument that the 1990 Agreement was the operative agreement between Luke Records and the members of 2 Live Crew, it expressly granted to Luke Records the copyrights in the works "from the inception of their creation … free from any claims whatsoever by" 2 Live Crew. [ECF 250-1 at 3–4]. The Defendants could not terminate a grant of rights they never owned.

The Defendants nonetheless argued that the 1990 Agreement was a confirmation or ratification of prior oral agreements to transfer ownership rights that the members of 2 Live Crew entered into with Luke.

But under § 204(a) of the Copyright Act, "[a] transfer of copyright ownership, other than by operation of law, is ***not valid*** unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (2024). While in some cases "a ***post***-transfer writing," as occurred here, can satisfy § 204(a), that post-transfer writing must (i) reference the existence of a prior contract, and (ii) that reference must contain sufficient "information about the deal itself." *Lyrick Studios, Inc. v. Big Idea Prods.*, 420 F.3d 388, 394–95 (5th Cir. 2005) (emphasis added; quoting *Radio Tel. Espanola S.A. v. New World Enter., Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999)).

_____

Defendants' counsel accused Weinberger of purposefully taking Luke Records into bankruptcy to profit from obtaining the rights to the Subject Works, all without any supporting evidence. [ECF 278 at 57].

In *Lyrick Studios*, the Fifth Circuit reversed the trial court's denial of judgment as a matter of law where the purported owner of the exclusive rights to distribute a television show failed to produce a signed writing or memorandum that contained sufficient information about the purported prior oral agreement.  *Id*.  The purported writing referenced the deal, but failed to contain sufficient information about the copyright transfer.

Here, the 1990 Agreement ***does not even reference the prior alleged oral agreements***.  The Court will scour the agreement to find any reference to a prior meeting of the minds between Luke Records and 2 Live Crew indicating that they had previously transferred ownership of their rights.  Thus, because the 1990 Agreement lacks a reference to the purported transfer deal, let alone specific details of the deal, it cannot render valid any prior oral agreements.  *Id*.

Not only is there no language ratifying prior oral agreements, but paragraph 16 of the 1990 Agreement (and paragraph 27 of the 1991 Agreements) contains an integration clause disclaiming any oral or other agreements.  "A 'merger' or 'integration clause' is a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract."  *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1265 n.5 (Fla. 5th DCA 2009) (citations and quotation marks omitted).  *And see* BLACK'S LAW DICTIONARY 989 (6th ed. 1990) (defining "merger clause" as "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document").

42

The district court's failure to give voice to the integration clause was itself reversible error.

Because the plain terms of the 1990 Agreement lacked any ratification, adoption, or even reference to the purported prior oral agreements, it was—as a matter of law—not a grant of rights that could be terminated.  For this additional reason, reversal and remand is required for entry of judgment in Lil' Joe's favor.

### D.   The Termination Notice Was Ineffective as to All Other Possible Grants of Copyrights.

Finally, because the notice of termination only specified the 1990 Agreement, which did not transfer any rights by its plain language, nor did it memorialize any prior grants of copyrights, the notice was ineffective as to any other possible grant by the members of 2 Live Crew.

A valid notice of termination under § 203 of the Copyright Act requires "a clear identification of," among other things, "[t]he date of execution of the grant being terminated," and "[a] brief statement reasonably identifying the grant to which the notice of termination applies."  37 C.F.R. § 201.10(2)(iii), (v).  Furthermore, "[c]lear identification … requires a *complete and unambiguous* statement of facts in the notice itself, without incorporation by reference of information in other documents or records."  37 C.F.R. § 201.10(3) (emphasis added).  Thus, having failed to "complete[ly] and unambiguous[ly]" set forth the "date of execution of," and a "brief statement reasonably identifying" the 1991 Agreement (and all subsequent grants or transfers through the various bankruptcies), the Defendants' termination notice had no effect on those grants.

43

Accordingly, because the only grant identified in the termination notice was the 1990 Agreement, but that Agreement was, as a matter of law, not a grant or transfer that could be terminated, the notice was ineffective to divest Lil' Joe Records of any rights to the subject albums.

## CONCLUSION

The final judgment should be reversed with directions to enter summary judgment in Lil' Joe's favor on its claim for a declaration that 2 Live Crew members Ross and Campbell relinquished their termination rights during their respective bankruptcy proceedings. *Alternatively*, reversal with directions to enter judgment as a matter of law in Lil' Joe's favor is appropriate: the 1990 Agreement dictated that the copyrights belonged to the record label from inception and it lacked any language referring to or incorporating alleged prior oral agreements, the trial evidence was consistent with the agreement's plain language establishing a work-for-hire relationship, and the termination notice was ineffective as to all subsequent grants.

Richard C. Wolfe
Florida Bar No. 355607
WOLFE LAW MIAMI, PA
175 SW 7th Street, Suite 2410
Miami, Florida 33130
Telephone: (305) 384-7370
Facsimile: (305) 384-7371
rwolfe@wolfelawmiami.com

Elliot B. Kula
Florida Bar No. 003794
KULA & ASSOCIATES, P.A.
12000 Biscayne Boulevard, Suite 221
Miami, Florida 33181
Telephone: (305) 354-3858
Facsimile: (305) 354-3822
eservice@kulalegal.com
elliot@kulalegal.com

By: /s/ Richard C. Wolfe
Richard C. Wolfe

By: /s/ Elliot B. Kula
Elliot B. Kula
*Counsel for Plaintiff/Appellant Lil' Joe Records, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses Times New Roman 14-point typeface and contains <u>11,100</u> words.

/s/ Elliot B. Kula<br>
Elliot B. Kula

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.  I also hereby certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Elliot B. Kula<br>
Elliot B. Kula